**E-FILED**

Wednesday, 18 January, 2006  02:30:31 PM

Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

JACQULINE SLOWICK,               )
                                 )
        Plaintiff,               )
                                 )
    v.                           )     No. 04-3170
                                 )
JO ANNE B. BARNHART,             )
Commissioner of Social Security, )
                                 )
        Defendant.               )

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Jacquline Slowick appeals from a final decision of the Social Security Administration (SSA) denying her request for Disability Insurance Benefits (DIB) under the Social Security Act, 42 U.S.C. §§ 416(I) and 423. Slowick brings this appeal pursuant to 42 U.S.C. § 405(g).  The parties have consented to a determination of this case by the United States Magistrate Judge, pursuant to 28 U.S.C. § 636.  Order, February 3, 2005 (d/e 11).  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  Plaintiff's Motion for Summary Judgment (d/e 9); Defendant's Motion for Summary Affirmance (d/e 13). For the reasons set forth below, the Court determines that the SSA's decision is supported by the law and the evidence.  The SSA's Motion for

Summary Affirmance is therefore allowed, and Slowick's Motion for Summary Judgment is denied.

## STATEMENT OF FACTS

A.    Medical History

Slowick was born on February 14, 1947.  In 1996, Slowick injured her left shoulder at work.  Slowick subsequently underwent shoulder surgery.  Slowick was also treated for carpal tunnel problems.  In July 2001, Slowick injured her right knee during work.  After Slowick continued to complain of pain, Dr. Abdul Foad, an orthopedic surgeon, performed a primarily diagnostic arthroscopic surgery on the knee in April 2002.  In May 2002, Dr. Foad noted that the incisions from the arthroscopy were well-healed.  He described Slowick's knee as "ligamentously stable" with a good range of motion.  A.R. at 126.  Dr. Foad noted some mild swelling, but no gross effusion.  Dr. Foad stated that he saw no need for further knee surgery, but he recommended professional assistance with emotional stressors that might be magnifying Slowick's symptoms.

Slowick saw Dr. Foad again ten weeks after the arthroscopy.  Dr. Foad noted minimal swelling, no effusion, a well-healed incision, and a good range of motion in the knee.  Dr. Foad reported that Slowick walked

with a normal gait.  Slowick, however, complained of a lot of pain in the
knee.  Dr. Foad noted that Slowick might have some arthritic pain in the
knee that may have been exacerbated by the accident.  He reported that
he did not believe he could make Slowick any better, stating that there are
"a lot of nonorthopedic issues going on."  A.R. at 125.

In December 2001, Dr. Rachel Rahman diagnosed Slowick with
depression, hypothyroidism, and tobacco abuse.  A.R. at 149.  In October
2002, Dr. Rahman diagnosed Slowick as having right knee pain, severe
anxiety, moderate mood disorder, suspected learning disability, tobacco
abuse, hypothyroidism, and high cholesterol.  Id. at 147.  Slowick was
treated with Wellbutrin for the mood disorder and Synthroid for the
hypothyroidism.  Slowick saw Dr. Rahman in March 2003, complaining of
intermittent hoarseness, increased stress, and "knee pain-spasm."  Id. at
218.  Dr. Rahman diagnosed Slowick as having allergic rhinitis,
hypothyroidism, and leg cramps.  In May 2003, Dr. Rahman again
examined Slowick, who informed the doctor that she was experiencing
chest pains, a burning sensation in her esophagus, increased leg cramps,
and anxiety.  Id. at 219.  Dr. Rahman adjusted Slowick's medications.  Id.
On November 3, 2003, Slowick again saw Dr. Rahman for right knee

pain.  Dr. Rahman's notes indicate that Slowick had experienced pain since the work accident and that her knee had become swollen the previous month after she "slid in caves." Id. at 220.  The doctor noted no significant right knee effusion. Id.  Dr. Rahman's notes from a November 24, 2003, follow-up indicate that Slowick "saw ortho – home exercises etc. recommended." Id.

In January 2004, Slowick informed Dr. Rahman that she was experiencing chest pains and epigastric pain.  Dr. Rahman's progress notes from January 14, 2004, report, with respect to Slowick's knee, that "Dr. Greene recommended therapy or exercise." Id. at 231.  On January 20, 2004, Slowick underwent a myocardial stress and resting test which showed no evidence of abnormalities. Id. at 240.  On January 30, 2004, Slowick underwent a CT scan of her abdomen and pelvis, which showed "No acute CT abnormalities." Id. at 243.

Turning to Slowick's mental health, in November 2002, she was evaluated by Dr. Frank Froman, a psychologist, at the request of the state disability determination service.   Dr. Froman conducted a mental status examination and administered an intelligence test.  From the intelligence test, Dr. Froman determined that Slowick's intellectual functioning was in

the "Borderline range." A.R. at 156. Dr. Froman reported that Slowick's overall thinking and reasoning abilities exceed those of approximately 2.0% of adults her age. He noted that Slowick might "experience difficulty in keeping up with her peers in a wide variety of situations that require age appropriate thinking and reasoning abilities." Id. Dr. Froman determined that Slowick had a verbal IQ of 66, which fell in the "Extremely Low" range, and a performance IQ of 79, which fell in the "Borderline" range. Id. Slowick's full scale IQ was measured at 70, in the "Borderline" range. Id. at 157.

Dr. Froman diagnosed Slowick as having an "[a]djustment disorder with mixed emotional features – anxiety and depression, secondary to recent termination from work," borderline intellectual functioning, knee problems, hypothyroidism, high cholesterol, and history of frozen shoulder. A.R. at 158. Dr. Froman noted that Slowick was experiencing current stressors relating to her finances and recent termination from work, which he characterized as "of moderate severity." Id. Dr. Froman assigned

Slowick a GAF score of 60.[1]  Id.  Dr. Froman concluded as follows:

> Jacquie appears to be able, from a psychological viewpoint, to
> perform simple one and two step assemblies at a competitive
> rate.  She is able to relate adequately to coworkers and
> supervisors. She can understand only oral and not written
> instructions. . . . [S]he reads only as well as a first grader.  She
> is able to manage cash benefits.  I believe she would have
> considerable difficulty, however, withstanding the stress
> associated with customary employment.

Id.

In December 2002, Slowick underwent a psychiatric review by L.

Hudspeth, Psy.D.  Dr. Hudspeth diagnosed Slowick as having "adjustment

disorder mixed mood secondary to job loss".  A.R. at 162.  In assessing

Slowick's functional limitations, Dr. Hudspeth noted no limitations relating

to the activities of daily living, maintaining social functioning, or episodes of

decompensation and moderate limitation in maintaining concentration,

persistence, or pace.  Id. at 169.  Dr. Hudspeth's report contains notes from

consulting physician Dr. James Graham, stating that Slowick was able to

carry out typical adult activities of daily living and that her illiteracy

---

[1]GAF is an assessment of an individual's overall level of psychological, social
and occupational functioning.  American Psychiatric Association, Diagnostic and
Statistical Manual of Mental Disorders, Text Revision 32 (4th ed. 2000).  Scores range
from 0 to 100, with lower numbers indicating more severe mental limitations.  Id. at 34.

and knee problems were the biggest impediments to work.  Id. at 171.  In

assessing Slowick's residual functional capacity, Dr. Hudspeth concluded:

> . . .  Recent job loss due to her inability to read and operate
> computer has resulted in some anxiety and dysphoria.
> Cognitive/memory skills are adequate for simple unskilled jobs
> requiring no written instructions.  She has no indication of any
> social impediment to the work place.  Adaptively she is able to
> carry out the typical tasks of adult independent living.

Id. at 175.  Dr. Hudspeth's report and the evidence in the file were

reviewed and affirmed by John Tomassetti, Ph.D., in January 2003.  Id.

In January 2003, Slowick began counseling at the Hancock County

Mental Health Center.  The initial tentative diagnosis was depressive

disorder, generalized anxiety disorder, parent-child relational problem,

hypothyroidism,  and high cholesterol.  A.R. at 179.  Slowick was assigned

a GAF of 60.  By July 2003, Slowick's counselor noted that Slowick was

doing very well and had met her goals.  Id. at 196.  In mid-July 2003,

Slowick and the counselor agreed that she could end her counseling, with

the understanding that Slowick could resume if needed.  Id. at 195.  In a

psychiatric follow-up on July 23, 2003, the counselor noted that "Jackie has

been doing very well.  We have discontinued counseling."  Id. at 194.  He

reported that Slowick had a GAF of 71.  Id.

In late August 2003, Slowick was referred back to counseling by Dr.
Woerner, a psychiatrist.  A.R. at 192.  Counseling records from August and
September 2003 indicate that Slowick was emotionally overwhelmed,
depressed, and angry.  Id. at 188-91.  Counseling records indicate that
Slowick failed to attend scheduled counseling sessions in October and
December 2003.  Id. at 184, 186-87.  On February 10, 2004, Slowick's
counselor adjusted Slowick's status to "refer for meds only" based on the
fact that Slowick had failed to follow up with counseling.  Id. at 229.  The
counselor noted that Slowick appeared to need ongoing counseling as well
as medications.  Id.

B.  <u>Administrative Hearing</u>

Slowick filed her application for DIB on August 23, 2002.  Slowick
sought DIB with an alleged onset date of June 6, 2001.  Slowick claimed to
be disabled as a result of problems with her knees and left shoulder, nerve
damage in her hand, and difficulty reading.  A.R. at 83.  Her claim was
denied initially because she had engaged in substantial gainful activity after
her alleged onset date.  Id. at 30-34.  Slowick changed her onset date to
October 4, 2002.  Id. at 63.  Even considering the new onset date,
Slowick's request for benefits was denied on reconsideration.  She

requested an administrative hearing, which was held June 11, 2003.  The Administrative Law Judge (ALJ) heard testimony from Slowick and from vocational expert Dr. Jeff Magrowski.

Slowick testified that she had an eighth-grade education and was divorced.  When asked her age, Slowick initially stated 45 years, but upon further questioning, she stated that she was 55.  Slowick testified that she had worked at the Navoo Cheese Company since 1989, doing line work that included wrapping and bagging cheese and placing it in boxes. Slowick was terminated from this employment in October 2002.  Slowick testified that she was terminated because she could not work or use computers which had been recently installed in the factory.  She stated that shoulder problems prevented her from lifting more than 26 or 27 pounds and from working fast enough.

Slowick stated that she had pain and limited movement of her left shoulder, swelling in her left hand, and carpal tunnel problems with her right hand.  Slowick testified that she had pains in her chest about twice a week that made it difficult to breath.  According to Slowick, the incidents of chest pain would last about four to five hours, often at night, and were, at times, accompanied by nausea.  Slowick stated that she had a burning

pain in her stomach during the day "all the time." A.R. at 265. Slowick also had right knee problems relating to an accident in the cheese factory. According to Slowick, it hurt to bend the knee or kneel, she had difficulty with stairs, and the knee would swell with changes in the weather.

Slowick testified that she was taking medication for thyroid problems. She reported being very fatigued and needing to nap during the day at least once. Slowick stated that she also had symptoms of depression including anxiety and crying spells, which at times required her to go to counseling.

Slowick testified that she lived in a house with her son. According to Slowick, her son did the housework, although she could do some dusting. Slowick reported that she had difficulty dressing herself and that she needed to sit on the bed while dressing because of her knee. Slowick also testified that she had problems sleeping and would wake up in the night, sometimes five times a night. During the day, Slowick stated that she watched television. Slowick testified that she had a driver's license and drove. She managed a bank account.

After Slowick's employment at the cheese factory was terminated, Slowick received unemployment benefits. Slowick testified that, during the

time she was receiving unemployment benefits, she was looking for a new

job.  According to Slowick, she filled out applications that she could take

home and complete.  When asked the type of positions for which she

applied, Slowick replied "Cleaning."  A.R. at 279.

Dr. Magrowski also testified.  Dr. Magrowski characterized Slowick's

past relevant work at the cheese factory as follows:

> One was like a packing line operator.  Based on her description
> it would be medium and unskilled, and in the national economy
> it's heavy and unskilled.  She was also a weigher on a
> production line.  This is medium and semiskilled work.  She was
> also a wrapper and a sealer.  As she testified, it would be at
> least medium.  In the national economy these jobs can be done
> at a light and unskilled level.

A.R. at 282.  The ALJ asked Dr. Magrowski, "If I were to give full credence

to the testimony that the claimant gave today as to her capabilities, would

she be capable, in your opinion, of performing any one of these three

jobs?"  Dr. Magrowski replied, "No."  Id. at 284.

C.    The ALJ's Decision

The ALJ issued his decision on April 21, 2004, concluding that

Slowick was not disabled within the meaning of the statute.  In reaching his

conclusion, the ALJ followed the five-step analysis set out in 20 C.F.R.

§ 404.1520.  The analysis requires a sequential evaluation of (1) whether

claimant is engaged in substantial gainful activity; (2) the severity and

duration of claimant's impairment; (3) whether the impairment equals a

listed impairment in Appendix 1 to 20 C.F.R. § 404, Subpt. P (Appendix 1);

(4) whether the impairment prevents claimant from doing her past relevant

work; and (5) whether claimant can perform other work, given her residual

functional capacity, age, education, and work experience.  20 C.F.R.

§ 404.1520(a)(4).  The claimant has the burden of presenting evidence and

proving the issues on the first four steps.  The SSA has the burden on the

last step; the SSA must show that, considering the listed factors, the

claimant can perform some type of gainful employment that exists in the

national economy.  Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

    The ALJ determined that Slowick met her burden on the first two

steps of the analysis with respect to her boarderline intellectual functioning,

but concluded that Slowick failed to demonstrate that her impairments were

severe enough to equal an impairment listed on Appendix 1 (step three).

A.R. at 13-14.  The ALJ then considered whether Slowick retained the

residual functional capacity to perform her past relevant work (step four).

The ALJ characterized Slowick's residual functional capacity as follows:

> she is unable to understand and carry out written instructions;
> she is able to perform simple, repetitive tasks; she is able to

understand, carry out and remember simple one or two step job
instructions; she is able to make judgments that are
commensurate with the functions of unskilled work; she is able
to respond appropriately to supervisors, co-workers and usual
work situations; and she is able to deal with changes in a
routine work setting.

Id. at 17.  Considering these limitations, the ALJ determined that Slowick
was able to return to her past relevant work.  Id. at 18.  Therefore, the ALJ
determined that Slowick was not disabled at step four and did not proceed
to consider step five.

> D.  The Appeals Council

Slowick appealed the ALJ's decision to the SSA Appeals Council.
A.R. at 7.  The Appeals Council denied Slowick's request for review on July
2, 2004.  Slowick filed her Complaint (d/e 2) in the present case on August
11, 2004, after the Court allowed her request to proceed in forma pauperis.

## ANALYSIS

This Court will reverse the decision of the SSA if that decision is not
supported by substantial evidence or results from an error of law.  Lopez v.
Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).  This Court reviews the ALJ's
factual findings to determine whether they are supported by substantial
evidence.  Substantial evidence is, "such relevant evidence as a
reasonable mind might accept as adequate" to support the decision.

Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept

the ALJ's findings if they are supported by substantial evidence and may

not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d

79, 82 (7th Cir. 1986). The ALJ further must at least minimally articulate his

analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333

(7th Cir. 1994).   The Court must be able to "track" the analysis to determine

whether the ALJ considered all the important evidence.  Diaz v. Chater,

55 F.3d 300, 308 (7th Cir. 1995).

Slowick contends that (1) she is disabled at step three under §

12.05(C) and/or (D) of Appendix 1; (2) the ALJ improperly discredited Dr.

Froman's opinion; (3) the ALJ improperly discredited Slowick's own

testimony based on the fact that she applied for unemployment benefits;

and (4) the ALJ's decision was not supported by substantial evidence.  As

set forth below, these claims of error fail.

A.  Appendix 1 Impairment

Under step three of the relevant analysis set forth above, a claimant

is eligible for benefits if he has an impairment, or combination of

impairments, which meets or equals an impairment found in Appendix 1.

Slowick claims that a finding that she is disabled is mandated under

Appendix 1, § 12.05 (C) and/or (D).  To meet or equal a listed impairment,

a claimant must satisfy all of the criteria of the listed impairment.  <u>Maggard</u>

<u>v. Apfel</u>, 167 F.3d 376, 380 (7th Cir. 1999).  At step three, Slowick bears the

burden of proving her condition meets or equals a listed impairment.

> Section 12.05, entitled "Mental Retardation," provides:
>
> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

Subsection C requires "[a] valid verbal, performance, or full scale IQ of 60

through 70 and a physical or other mental impairment imposing an

additional and significant work-related limitation of function."

Subsection D requires

> A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

In the present case, the ALJ determined that Slowick's condition was not severe enough to qualify her for benefits at step three. This decision is supported by substantial evidence. While Slowick had a verbal IQ score of 66, there was no evidence that she had deficits in adaptive functioning initially manifested during the developmental period such that § 12.05 would apply. Furthermore, there are numerous notations in the medical records that indicate that Slowick can carry out the typical activities of daily adult life. With respect to subsection D, Dr. Hudspeth noted no limitations relating to the activities of daily living, maintaining social functioning, or episodes of decompensation. A.R. at 169. Additionally, none of Slowick's medical records indicate a finding of mental retardation by a doctor or psychologist. The ALJ's determination that Slowick did not have an Appendix 1 mental impairment is affirmed.

B. Dr. Froman's opinion

Slowick claims that the ALJ abused his discretion by giving "little weight" to Dr. Froman's opinion. Specifically, Slowick argues that the ALJ erred in discrediting Dr. Froman's statement that Slowick would have considerable difficulty withstanding stress associated with customary employment. Dr. Froman was a consulting psychologist, and as such, his

opinion is not entitled to controlling weight, but rather subject to analysis

under the factors enumerated in 20 C.F.R. § 404.1527(d).

The ALJ's opinion states:

> The undersigned gives little weight to the doctor's opinion
> regarding the claimant's ability to withstand stress, as this
> opinion is not consistent with the medical record as a whole, or
> with the doctor's own examination and treatment notes, or with
> the claimant's work history.  On the whole, the doctor appears
> to have accepted the claimant's subjective complaints, and the
> above-noted opinion regarding the ability to withstand stress
> does not appear reflective of any objective evidence in the
> record.

A.R. at 15.  Under 20 C.F.R. § 404.1527(d)(4), the more consistent an

opinion is with the record as a whole, the more weight it is afforded.  As the

ALJ noted, Dr. Froman's statement that Slowick would have considerable

difficulty withstanding stress associated with customary employment is

inconsistent with Dr. Froman's other opinions and with the record as a

whole.  Dr. Froman opined that, from a psychological viewpoint, Slowick

could perform simple one and two step assemblies at a competitive rate

and relate adequately to coworkers and supervisors.  A.R. at 158.

Moreover, the record contains significant evidence that contradicts Dr.

Froman's opinion.  Indeed, Dr. Hudspeth, whose work was affirmed by Dr.

Tomassetti, expressly found that Slowick was not significantly limited in her

"ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms . . . ." Id. at 174.  The ALJ did not err in assessing Dr. Froman's opinion evidence.

   C.  Slowick's Testimony

   Slowick asserts that the ALJ erroneously discredited her testimony based on the fact that she received unemployment benefits following her termination.  Ordinarily, a reviewing court defers to an ALJ's credibility determination.  Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004). The general rule is that absent legal error, an ALJ's credibility finding will not be disturbed unless "patently wrong."  Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).  An ALJ, however, may not disregard a claimant's subjective complaints merely because they are not fully supported by objective medical evidence, but may discount subjective complaints that are inconsistent or conflicting with the evidence as a whole.  Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).  When assessing a claimant's credibility, the ALJ must consider the degree to which a claimant's allegations of pain and other symptoms are consistent with medical signs, laboratory findings, diagnoses, and opinions by treating or examining physicians and other medical sources and must explain adequately the

reasons behind the credibility finding.  See Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).

In the present case, the ALJ determined that Slowick's allegations as to the intensity, persistence, and limiting effects of her symptoms were not well supported by probative evidence or entirely credible.  A.R. at 17.  In making this determination, the ALJ considered not only the fact that Slowick received unemployment benefits, but also the medical evidence of record.  The ALJ correctly noted that Slowick's statements of her symptoms were not supported by medical evidence.  With respect to her knee, Dr. Foad noted that Slowick walked with a normal gait and had a good range of motion in the knee.  Ten weeks after the arthroscopy, Dr. Foad reported only minimal swelling in the knee and no effusion.  Similarly, Dr. Rahman, in November 2003, found no significant right knee effusion. Dr. Rahman referred Slowick to the orthopedic department, resulting in a recommendation of home exercises.  Neither Dr. Foad or Dr. Rahman placed Slowick under any restrictions relating to her knee.

Tests relating to Slowick's complaints of chest pain likewise showed no signs of abnormalities.  Additionally, Slowick underwent a CT scan of her abdomen and pelvis, which showed no abnormalities.  Slowick also

testified that she experienced shoulder pain, but there is nothing in the record to support a finding that Slowick informed any medical professionals about this pain.  The ALJ's finding regarding Slowick's credibility is supported by the record, explained in his decision, and not patently wrong. See Brindisi, 315 F.3d at 787-88.  Slowick's claim of error fails.

D.  Substantial Evidence

Slowick contends that the ALJ erred in concluding that she could perform her past relevant work.  Slowick raises two challenges to the ALJ's determination.  First, Slowick argues that the ALJ overstated her residual functional capacity by inappropriately concluding that Slowick could understand written instructions.  An examination of the ALJ's decision shows that Slowick's argument is misplaced.  The ALJ recognized that Slowick was unable to understand and carry out written instructions and included this limitation in his assessment of Slowick's residual functional capacity.  See A.R. at 17.  Slowick's challenge to the ALJ's assessment of her residual functional capacity fails; the Court finds that the ALJ's residual functional capacity assessment is supported by substantial evidence.

Slowick further argues that the combination of her impairments prevents her from performing her past work.  Slowick relies in part on the

vocational expert's testimony that, if full credence were given to Slowick's testimony as to her capabilities, Slowick would be unable to perform her past three positions at the cheese factory.  <u>See</u> A.R. at 284.  The ALJ, however, did not give full credence to Slowick's testimony as discussed above.  Therefore, Slowick's reliance on the vocational expert's opinion is inapposite.

Furthermore, the ALJ's determination that Slowick's impairments did not prevent her from performing her past work is supported by substantial evidence.  As previously noted, the ALJ characterized Slowick's residual functional capacity as follows:

> she is unable to understand and carry out written instructions; she is able to perform simple, repetitive tasks; she is able to understand, carry out and remember simple one or two step job instructions; she is able to make judgments that are commensurate with the functions of unskilled work; she is able to respond appropriately to supervisors, co-workers and usual work situations; and she is able to deal with changes in a routine work setting.

A.R. at 17.  This assessment is consistent with the record evidence as set forth above.  Furthermore, the vocational expert testified that Slowick's positions with the cheese company ranged from medium, skilled to medium, unskilled work, but could be done at a light and unskilled level in the national economy.  <u>Id</u>. at 282.  Slowick did not challenge this

assessment, despite being represented by counsel at the hearing.  A

claimant is able to perform her past relevant work if she can either perform

her actual past relevant job or perform her past relevant job as it is

normally performed in the national economy.  <u>Anderson v. Bowen</u>, 868

F.2d 921, 925 n. 11 (7th Cir. 1989).  Unskilled work is work which needs

little or no judgment to do simple duties that can be learned on the job in a

short period of time.  20 C.F.R. § 404.1568(a).  Light work involves lifting

no more than 20 pounds at a time with frequent lifting or carrying of objects

weighing up to 10 pounds.  20 C.F.R. § 404.1567(b).  Given the ALJ's

residual functional capacity assessment, it is clear that Slowick can perform

light, unskilled work.  Given the vocational experts testimony, substantial

evidence supports the ALJ's finding that Slowick was not disabled at step

four, where the burden of proof is with the claimant.  Slowick's claim of

error fails.

THEREFORE, Defendant's Motion for Summary Affirmance (d/e 13)

is ALLOWED.  Plaintiff Jacquline Slowick's Motion for Summary Affirmance

(d/e 9) is DENIED.  The decision of the Commissioner of Social Security is

AFFIRMED.  All pending motions are denied as moot.  THIS CASE IS

CLOSED.

IT IS THEREFORE SO ORDERED.

ENTER:   January 18, 2006

       FOR THE COURT:

                     s/ Byron G. Cudmore

              _____
                    BYRON G. CUDMORE
             UNITED STATE MAGISTRATE JUDGE